# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

TELECOMMUNICATION SYSTEMS, INC.,

Plaintiff,

v.

EUTELSAT AMERICA CORP. AND
SES GOVERNMENT SOLUTIONS, INC.,

Defendants.

Civil Action No. _____

**JURY TRIAL DEMANDED**

## COMPLAINT

For its Complaint against Defendants Eutelsat America Corp. ("Eutelsat America") and

SES Government Solutions, Inc. ("SES-GS") (collectively, "Defendants"), Plaintiff

TeleCommunication Systems, Inc. ("TCS") states as follows:

## <u>INTRODUCTION</u>

1.      This is an action for damages and injunctive relief arising out of a conspiracy to

unlawfully restrain trade and interfere with TCS's business relationship with the United States

government under a multiple award, indefinite delivery, indefinite quantity ("IDIQ") contract for

satellite communications services.

2.      As demonstrated below, Defendants SES-GS and Eutelstat America conspired to

make false misrepresentations about TCS's ability to provide such services in order to void a

task order contract award granted to TCS in excess of $72.3 million.  Defendants further

conspired to unlawfully deny TCS access to satellite bandwidth for use in performing under the

task order award.  This unlawful conduct resulted in damages to TCS of more than $14 million.

3.      Defendants SES-GS and Eutelstat America have combined and conspired within the meaning of Section 1 of the Sherman Antitrust Act so as to unreasonably injure competition. Unless restrained by this Court, Defendants will continue their anticompetitive conspiracy. Accordingly, TCS brings this case to restore lost competition.

## THE PARTIES

4.      TCS is a Maryland corporation with its principal place of business located at 275 West Street, Annapolis, MD 21401.

5.      SES-GS, formerly named Americom Government Services, Inc., is a Delaware corporation with its principal place of business located at 2010 Corporate Ridge, Suite 550, McLean, VA 22102.  SES-GS is a subsidiary of SES S.A. ("SES"), a publicly traded Luxembourg company and one of the world's largest satellite operators.

6.      Eutelsat America is a Delaware corporation with its principal place of business located at 1776 I Street NW, Suite 810, Washington, DC 20006.  Eutelsat America is a subsidiary and the North American sales and marketing arm of Eutelsat S.A. ("Eutelsat"), a publicly traded French company and one of the world's three largest satellite operators.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332, as a result of the diversity of the parties, pursuant to 28 U.S.C. §§ 1331 and 1337 for TCS's antitrust claim, and pursuant to the Court's supplemental jurisdiction under 28 U.S.C. § 1367(a).  The amount in controversy is in excess of $75,000.00, exclusive of interest and costs.

8.      This Court has personal jurisdiction over the Defendants because they have conducted, engaged in, and carried out business within the District of Columbia; they have committed tortious acts within the District of Columbia; and they have engaged in substantial and not isolated activity within the District of Columbia.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the relevant events giving rise to these claims occurred in this district.

## FACTUAL ALLEGATIONS

### Plaintiff TCS

10.     Plaintiff TCS is a leader in highly reliable and secure mobile communication technology.

11.     Headquartered in Annapolis, Maryland, TCS maintains technical, service and sales offices around the world.

12.     TCS has two business segments.  First, in the Government Segment, TCS provides professional services including field support of deployable wireless systems and cybersecurity training to the U.S. Department of Defense ("DoD") and other government customers. TCS owns and operates secure satellite teleport facilities, resells access to satellite airtime (known as "space segment"), and designs, furnishes, installs and operates wireless communication systems and components.  Second, in the Commercial Segment, TCS is one of two leading companies that enable 9-1-1 call routing via cellular, Voice Over Internet Protocol ("VoIP"), and next generation technology.

13.     TCS has a nearly thirty year history of providing proven, reliable and cost-effective secure communication solutions for all tiers of government.  Millions of consumers around the world use TCS wireless apps as a fundamental part of their daily lives. Government agencies utilize TCS's cyber security expertise, professional services, and highly secure deployable satellite solutions for mission-critical communications.

14.     TCS engineers and provides secure, wireless communication solutions, including deployable communication systems and related support services with emphasis on satellite-based

technology, to agencies of the DoD, and other global government customers.  TCS is a single-source for a range of mission-critical satellite, baseband, and wireless communications for government customers.

15.     TCS is at the forefront of new mobile cloud computing services providing wireless applications for navigation, hyper-local search, asset tracking, social applications, and telematics.

**Fixed Satellite Services**

16.     Fixed satellite services ("FSS") refers to satellite services that use fixed terrestrial terminals.

17.     The transponders on a fixed satellite service satellite transmit radio signals to the earth using radio spectrum, in assigned frequency bands.

18.     Given their stationary position and ability to provide coverage to a large geographic area, fixed satellite service satellites are commonly used to provide a variety of communications services.

19.     Once a satellite has been launched into orbit, users of fixed satellite services acquire bandwidth capacity either directly from a satellite operator ("FSS Operator) or indirectly through a satellite service provider ("FSS Provider") or, as part of a broader satellite communications solution, from a satellite services integrator ("FSS Integrator").

20.     FSS Operators own and operate satellites and lease bandwidth capacity to customers on a wholesale basis.  Global Satellite Operators provide seamless coverage throughout the world for international telecom service providers and broadcasters.  The three largest global FSS Operators are SES, Eutelstat, and Intelstat/PanAmSat ("Intelstat").

21.     FSS Providers are customers of FSS Operators.  An FSS Provider purchases bandwidth capacity from an FSS Operator and then resells the capacity to end customers, including the federal government.

22.     FSS Integrators are customers of both FSS Operators and FSS Providers.  An FSS Integrator purchases bandwidth capacity from an FSS Operator and then resells the capacity to end customers, including the federal government, along with other value-added services.

23.     TCS is an FSS Integrator.  Both Defendants are subsidiaries of FSS Operators and act both as FSS Providers and FSS Integrators.

24.     The federal government relies on commercial fixed satellite services for a variety of communication needs, including military communications.

25.     Within the federal government, the DoD is the largest user of commercial bandwidth.   The department is increasingly relying on commercial fixed satellite services to meet demand unable to be met by its military communications satellites, particularly in support of ongoing operations in the Middle East.

26.     Four frequency bands—C, Ku, Ka, and X—are most commonly associated with fixed satellite services.  The military primarily uses Ku-band satellites because the dishes offer more mobility than C-band satellite dishes.

27.     As the DoD has relied more on commercial fixed satellite services to support its operations, the availability and affordability of commercial satellite bandwidth, particularly Ku-band satellite bandwidth, has been important in allowing DoD to meet its global communications needs.

28.     Because of mergers and acquisitions, the number of commercial FSS Operators has declined significantly.  There are only three FSS Operators having the global Ku-band

satellite bandwidth necessary to meet DoD's worldwide communications needs, Intelsat, SES, and Eutelsat.

29.     With fewer FSS Operators providing the global coverage needed, concerns have arisen about the availability and affordability of commercial bandwidth capacity for the government to continue to meet its worldwide communications needs.

30.     At the same time, recent horizontal and vertical integration that has occurred in the FSS industry has changed the structure of the industry and altered the relationship between FSS Operators, FSS Providers, and FSS Integrators.  The global FSS Operators have acquired or established U.S. subsidiaries, including Defendants SES-GS and Eutelstat America, allowing them to compete against TCS and other FSS Integrators for government contracts.  As a result, SES and Eutelsat are in a position to take anticompetitive actions that favor their subsidiaries, the two Defendants, interfere with competition, and cause harm to other FSS Integrators, such as TCS, FSS Providers, and the end consumers of the services provided by FSS Integrators and FSS Providers.

**FCSA Program**

31.     The Future Commercial Satellite Communications ("SATCOM") Services Acquisition ("FCSA") process is managed jointly by the U.S. General Services Administration ("GSA") and the Defense Information Systems Agency ("DISA").

32.     FCSA has broken SATCOM into three areas, including transponder capacity (bandwidth) and subscription services (plug-and-play services). The third segment, custom satellite solutions, is covered under an FCSA IDIQ contract, Custom SATCOM Solutions ("CS2").

**CS2**

33.     CS2 enables the DoD and federal civilian agencies to purchase end-to-end, turnkey solutions that incorporate FSS services through both GSA and DISA.

34.     The program consolidates transponder capacity (satellite bandwidth), subscription services (including terminal and bandwidth combinations) and end-to-end solutions contracting vehicles into one program for procuring custom satellite communication solutions from a group of qualified contractors.

35.     In August 2012, the GSA and DISA announced the award of CS2 contracts to eight prime contractors, including TCS and Defendant SES-GS.  The CS2 contracts have a five-year contract period (three base years with two, one-year options), and a ceiling of $2.6 billion.

36.     The CS2 contracts are Multiple Award, IDIQ Contracts.  Accordingly, task orders must be awarded before any service or equipment can be delivered.  The task order must be fixed price.

37.     The eight prime contractors compete for task orders that will provide customized, customer-defined end-to-end solutions that include satellite bandwidth, teleport access and network management, the equipment needed for satellite communications and engineering support.

38.     Thus, TCS and SES-GS are in direct competition for CS2 task orders.  Indeed, the GSA has expressly instructed:  "All CS2 contractors should be afforded the fair opportunity to compete for **ALL** CS2 Task Orders, regardless of dollar value."  GSA, *CS2 Customer User Guide* (January 2013) (emphasis in original).

39.     As prime contractors, TCS and Defendant SES-GS often rely significantly upon other companies as subcontractors to fulfill its commitments under CS2 task order programs.  In particular, as FSS Integrators, TCS and SES-GS secure bandwidth from FSS Operators such as

Eutelsat, SES, and Intelsat, including through FSS Providers such as Hunter Communications, Inc. ("Hunter Communications"), Defendant SES-GS, and Harris CapRock.

## USMC Commercial Ku SATCOM Task Order

40.     On January 31, 2013, DISA's contracting office, the Defense Information Technology Contracting Organization ("DITCO"), released an RFP for the United States Marine Corps Commercial Ku SATCOM Bandwidth and Network Support Task Order under the CS2 contract, FCSA Task Order CS20002.00 ("USMC Commercial Ku SATCOM Task Order").

41.     The purpose of the USMC Commercial Ku SATCOM Task Order is to expand and enhance the global ground communications capabilities of the USMC by providing the USMC with 300 MHz of static Ku satellite bandwidth worldwide in four geographic regions, including the Western Pacific, Atlantic, Indian Ocean, and Eastern Pacific.  This additional bandwidth will increase the amount of data that can be transmitted within the Military Satellite Communications network to enable communication capabilities required by the USMC.

42.     In March 2013, Plaintiff TCS and SES-GS both submitted responses to the RFP for the USMC Commercial Ku SATCOM Task Order.

43.     On April 10, 2013, DITCO issued a request for a Final Proposal Revision for the USMC Commercial Ku SATCOM Task Order, and the next day, both TCS and SES-GS submitted their final proposal revisions for Program CS20002.

44.     Plaintiff TCS had previously entered into a Teaming Agreement with Intelsat General Corporation, a FSS Provider, to provide a proposal for the USMC Commercial Ku SATCOM Task Order.  TCS also had a commitment from Encompass Government Services to supply through Hunter Communications, a satellite bandwidth reseller, a portion of the remaining capacity (from one Eutelsat satellite) needed for the USMC Commercial Ku SATCOM Task Order.  Through these agreements, TCS had obtained commitments for

sufficient satellite bandwidth to meet the USMC Commercial Ku SATCOM Task Order bandwidth requirements for use at the time of the contract award.

45.     On information and belief, and unlike TCS's bid, which relied primarily on bandwidth from Intelsat and only a limited amount of bandwidth from Eutelsat America, other FSS Operators and resale channels, SES-GS's bid largely relied on bandwidth from its parent SES's fleet and Eutelsat America, directly or through resale channels from Harris CapRock. Thus, it was in Eutelsat America's and its parent Eutelsat's interest to have SES-GS be awarded the USMC Commercial Ku SATCOM Task Order over TCS.

46.     During the pendency of the USMC Commercial Ku SATCOM Task Order award, the publicly traded shares of Eutelsat, Eutelsat America's French parent company, fell sharply after warnings of lower revenues from the U.S. government.  Analysts began revising downward their estimates for Eutelsat's revenues and performance to reflect lower volume requirements and future pricing pressure in negotiations with the U.S. government and military.  Eutelsat furiously took to the press in an attempt to rebut the analysts' commentary and protect its share price around the time DITCO was making its decision on the USMC Commercial Ku SATCOM Task Order.

47.     On April 22, 2013, DITCO awarded TCS with the contract for USMC Commercial Ku SATCOM Task Order, contract HC1013-13-F-0018.  DITCO also provided a written debriefing to SES-GS on April 25, 2013.

48.     When TCS was awarded the USMC Commercial Ku SATCOM Task Order contract, TCS's $72,352,032 contract price was made publicly available, including to Defendants SES-GS and Eutelsat America.

49.     On May 2, 2013, SES-GS filed a bid protest for the USMC Commercial Ku SATCOM Task Order contract based on a false representation that TCS did not have the required bandwidth when it submitted its response to the RFP for the USMC Commercial Ku SATCOM Task Order.  In the bid protest, SES-GS further falsely represented that "TCS, after award, had made multiple unsuccessful efforts through intermediaries to obtain use of [satellite] capacity" and that such "evidence shows that TCS did not have the required capacity lined up to be ready for 'Day 1.'"

50.     To support its false representations in its bid protest, SES-GS purports to rely on an April 17, 2013 meeting with a TCS employee and a communication between TCS and Eutelsat "on or around May 1, 2013."

51.     Specifically, SES-GS falsely represented in its bid protest that: "On April 17, 2013, a TCS employee told SES-GS employees . . . during a meeting held at TCS that TCS had included SES fleet bandwidth in its [USMC Swan] Task Order proposal."

52.     TCS did meet with SES-GS's Vice President James Hooper and Senior Director Stephen R. Barr on April 17, 2013, but not to discuss anything to do with the USMC Commercial Ku SATCOM Task Order as it was a pending award and TCS assumed SES-GS was one of the key competitors bidding on that program.  Instead, TCS and SES-GS's employees Hooper and Barr discussed other future potential opportunities under the broader CS2 program, including potential teaming arrangements on forthcoming opportunities for Special Operations Command, Joint Communications Support Element, National Guard and Government Education Training Network.  SES-GS's employees initiated the only discussion concerning satellite bandwidth during that meeting when they questioned why TCS had not used very much SES fleet bandwidth for Army Defense Wideband Transmission Systems CS2 Task Order CS200001.

TCS noted that it had previously had difficulty obtaining link budgets (the necessary information to confirm sufficient performance of the satellite network system) from SES-GS on earlier projects.

53.      SES-GS also falsely represented in the bid protest that: "Eutelsat itself was also contacted on or around May 1, 2003 directly by TCS as part of TCS's efforts to get a commitment for TCS" and that such inquiry indicates that TCS's proposal for the USMC Commercial Ku SATCOM Task Order was deficient.

54.      TCS did meet with Eutelsat America on May 1, 2013, but, again, not to discuss anything to do with the USMC Commercial Ku SATCOM Task Order.  Instead, TCS and Eutelsat America met to discuss other future potential opportunities under the broader CS2 program.  At the beginning of the meeting, Eutelsat America's representatives at the meeting, Vice President of Sales Paul Attner and Vice President for Client Management Mary Salih, congratulated TCS on the USMC Commercial Ku SATCOM Task Order award and expressed their disappointment that TCS's proposal had not included more Eutelsat satellite bandwidth. TCS responded by offering to consider any offers from Eutelsat for bandwidth, but at no time indicated that it needed such bandwidth for the USMC Commercial Ku SATCOM Task Order.

55.      On information and belief, Defendants SES-GS and Eutelsat America agreed to disclose to each other their respective discussions with TCS, and then intentionally misrepresent these discussions with TCS to manufacture grounds for a bid protest from SES-GS in an attempt to have the USMC Commercial Ku SATCOM Task Order contract taken from TCS and awarded to SES-GS.

56.      In response to SES-GS's and Eutelsat America's false representations in the SES-GS bid protest, DITCO issued a Stop-Work order on the USMC Commercial Ku SATCOM Task

Order contract and subsequently, on May 17, 2013, issued a Notice of Agency Corrective Action through which DITCO permitted previously unsuccessful offerors, including Defendant SES-GS, the opportunity to submit entirely new Final Proposal Revisions, effectively terminating TCS's prospective $72.3 million contract under the USMC Commercial Ku SATCOM Task Order.

57.     In an attempt to mitigate the $72.3 million loss caused by SES-GS's and Eutelsat America's false representations in the SES-GS bid protest, TCS contested DITCO's Corrective Action, confirmed that TCS had sufficient bandwidth to perform at the time of the contract award, and submitted a Final Proposal Revision in accordance with the Corrective Action.

58.     Because TCS's original contract price had been made public at the time of the contract award, the previously unsuccessful offerors had the opportunity to submit new Final Proposal Revisions for the USMC Task Order that deliberately undercut TCS's original contract price.  Thus, in order to have any opportunity to reclaim the USMC Commercial Ku SATCOM Task Order award, and mitigate some of the damage caused by SES-GS's and Eutelsat America's false representations, TCS had to slash its price proposal down to $58,311,653.70 from the original $72,352,032.00 contract price.

59.     As part of its response to the Corrective Action, TCS requested letters from its bandwidth suppliers confirming the commitments from those suppliers to provide the necessary bandwidth to fulfill the USMC Commercial Ku SATCOM Task Order at the time of the contract award.  Intelsat General, who was providing the substantial majority of the bandwidth for TCS's proposal under a Teaming Agreement, promptly provided such confirmation.

60.     TCS's other bandwidth supplier, Hunter Communications, was delayed in providing its confirmation because Eutelsat America, which had previously committed bandwidth to Hunter, would not respond to Hunter's request to confirm that prior commitment.

Eutelsat America initially refused to provide such confirmation because it knew from its ongoing conspiracy with SES-GS that Hunter's request was for TCS's response to the Corrective Action for the USMC Commercial Ku SATCOM Task Order.

61.     On July 31, 2013, after receiving the new Final Proposal Revisions, DITCO awarded TCS the USMC Commercial Ku SATCOM Task Order contract and permitted TCS to proceed with work under that new contract, which reflected the lower price TCS was forced to bid to win back the project and which reduced the value of the contract to TCS by $14,040,378.30.

### The Conspiracy Continues

62.     After TCS was re-awarded the USMC Commercial Ku SATCOM Task Order, Defendants SES-GS and Eutelsat America continued their conspiracy by interfering with TCS's relationship with the U.S. government under the CS2 contract, and particularly the USMC Commercial Ku SATCOM Task Order contract, by conspiring to deny TCS access to satellite bandwidth.

63.     When TCS submitted its bid for the USMC Commercial Ku SATCOM Task Order, it had previously confirmed bandwidth availability through Encompass Government Services on Eutelsat's E-172A satellite.  Such bandwidth is part of Eutelsat's satellite fleet. After the contract award, the USMC required an additional 6 to 8 MHz of satellite coverage.

64.     Although TCS could satisfy the USMC's requirement by using bandwidth from another satellite provider and moving a landing antenna at a US army base in Japan, such change required Host Nation Approval, a process that typically takes one to two months to complete. To sustain the USMC's mission in the interim, DISA and the USMC directed TCS to seek access to other Eutelsat satellite beams.  But, as part of their continued conspiracy, Eutelsat America and

SES-GS denied TCS the necessary one to two month access to this limited additional satellite

coverage.  Instead, SES-GS demanded that TCS purchase four times the required amount of

bandwidth and do so for the full, multi-year term of the USMC Task Order contract.

65.    During this time SES-GS also made several calls to DISA, including to DISA's

legal counsel on or about August 15th, 16th, and 21st, accusing the USMC of illegally operating

on SES satellite bandwidth for which it did not have authorization and claiming, despite the bid

protest period being closed, that TCS's proposal could not meet the USMC Commercial Ku

SATCOM Task Order specifications.

**Harm To Competition**

66.    Given their relationships with their respective FSS Operator parent companies,

the ongoing combination and conspiracy between SES-GS and Eutelsat America to deny

competitor FSS Integrators from access to worldwide Ku-band satellite coverage harms

competition in the market for worldwide commercial Ku-band satellite communications services

to the United States Government.

67.    The United States Government's individual task order requirements almost

always require worldwide satellite Ku-band satellite coverage that cannot be met by satellite

bandwidth from just a single FSS Operator, but instead requires Ku-band satellite coverage from

a combination of two of the three leading FSS Operators, Intelsat, SES, and Eutelsat.

68.    By denying competitor FSS Integrators such as TCS from acquiring SES or

Eutelsat Ku-band satellite bandwidth capacity or forcing competitor FSS integrators to pay

supra-competitive prices for such capacity, the vertical and horizontal collusion among SES-GS,

Eutelsat America, and their respective FSS Operator parent companies injures and restrains

competition in the market for worldwide commercial Ku-band satellite communication services

to the United States Government.

69.     A small but significant increase in prices for worldwide commercial Ku-band satellite communication services would not result in the United States Government turning to companies outside the United States as suppliers.  Accordingly, the United States is the relevant geographic market.

70.     Further, given the federal government's need for and heavy reliance on worldwide commercial Ku-band satellite services for military communications, which cannot be met by military satellites or other satellite providers, the United States Government is unable to turn elsewhere to satisfy its satellite communication needs.  In addition, the high costs of manufacturing and launching fixed satellites and the substantial international and domestic licensing and bureaucratic hurdles serve as barriers against other companies entering the market.

**COUNT I**
**TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**
**(SES-GS)**

71.     TCS realleges and incorporates by reference paragraphs 1 through 70 as if restated in full.

72.     SES-GS unlawfully, intentionally and willfully misrepresented its and Eutelsat America's discussions with TCS in order to manufacture grounds for a bid protest.

73.     SES-GS's intentional and false misrepresentations in the bid protest were explicitly and admittedly intended to cause TCS to lose its USMC Commercial Ku SATCOM Task Order contract award and were without justification.

74.     SES-GS's misrepresentations in the bid protest were the direct and proximate cause of  DITCO issuing a Corrective Action that effectively terminated TCS's prospective contract under the USMC Task Order, and reopened the bidding process after TCS's original contract award price had already been made public, forcing TCS to submit a new, substantially reduced price, and resulting in mitigated damages of, at least, the more than $14 million

difference between TCS's original contract award and the modified contract award and the expenses TCS incurred in responding to SES-GS's false misrepresentations.

## COUNT II
## <u>TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY</u>
### (Eutelsat America)

75.     TCS realleges and incorporates by reference paragraphs 1 through 74 as if restated in full.

76.     Eutelsat America unlawfully, intentionally and willfully misrepresented its discussions with TCS in order to manufacture grounds for a bid protest against TCS's contact award under the USMC Commercial Ku SATCOM Task Order.

77.     Eutelsat America's intentional and willful misrepresentations in the bid protest were intended to cause TCS to lose its USMC Commercial Ku SATCOM Task Order contract award and without justification.

78.     Eutelsat America's misrepresentations in the bid protest were the direct and proximate cause of  DITCO issuing a Corrective Action that effectively terminated TCS's prospective contract under the USMC Task Order, and reopened the bidding process after TCS's original contract award price had already been made public, forcing TCS to submit a new, substantially reduced price, and resulting in mitigated damages of, at least, the more than $14 million difference between TCS's original contract award and the modified contract award and the expenses TCS incurred in responding to Eutelsat's false misrepresentations.

## COUNT III
## <u>INJURIOUS FALSEHOOD</u>
### (SES-GS)

79.     TCS realleges and incorporates by reference paragraphs 1 through 78 as if restated in full.

80.     SES-GS knowingly and intentionally published false and disparaging statements concerning TCS's business and its ability to perform under the contract for the USMC Commercial Ku SATCOM Task Order to DITCO as stated with more particularity in this complaint.

81.     SES-GS knowingly and intentionally published such false and disparaging statements to DITCO with the admitted purpose of terminating TCS's prospective contract for the USMC Commercial Ku SATCOM Task Order.

82.     SES-GS published such false and disparaging statements knowing those statements were false.

83.     SES-GS's false and disparaging statements were the direct and proximate cause of DITCO issuing a Corrective Action that effectively terminated TCS's prospective contract for the USMC Commercial Ku SATCOM Task Order, and reopened the bidding process after TCS's original contract award price had already been made public, forcing TCS to submit a new, substantially reduced price, and resulting in mitigated damages of, at least, the more than $14 million difference between TCS's original contract award and the modified contract award and its expenses incurred to respond to SES-GS's false and disparaging statements.

**COUNT IV**
**CIVIL CONSPIRACY**

84.     TCS realleges and incorporates by reference paragraphs 1 through 83 as if restated in full.

85.     An agreement and conspiracy existed and continues to exist between and among the Defendants to unlawfully interfere with TCS's business relationship with the U.S. Government under the CS2 contract including by unlawfully making false and disparaging

representations about TCS's bids for task orders and ability to perform its contractual obligations as set forth with more particularity in this Complaint.

86.     Both Defendants knowingly agreed to engage, and did engage, in one or more overt acts in pursuit of the conspiracy as set forth with more particularity in this Complaint.

87.     TCS has been proximately damaged by the conspiracy and the Defendants' actions in furtherance thereof in an amount to be determined at trial.

### COUNT V
### SHERMAN ANTITRUST ACT 15 U.S.C. § 1

88.     TCS realleges and incorporates by reference paragraphs 1 through 87 as if restated in full.

89.     TCS brings this count under Sections 4 and 6 of the Clayton Act (15 U.S.C. §§ 15 and 26) to recover damages, including treble damages, sustained by TCS as a result of its being injured in its business and property by reason of Defendants' violations of Section 1 of the Sherman Act (15 U.S.C. §1); to obtain injunctive relief against threatened loss or damage as a result of such violations; and to recover the expense of bringing and maintaining this action, including reasonable attorneys' fees.

90.     Defendants Eutelsat America and SES-GS have entered into agreements with each other and other business entities with the intent to harm or restrain competition in the market for worldwide commercial Ku-band satellite communication services to the United States Government and thereby actually injured competition in that market as set forth with more particularity in this Complaint.

91.     Due to the illegal acts of these Defendants in restraint of trade, TCS has been harmed in its business and property in an amount to be determined at trial.

92.   Unless Defendants are enjoined, TCS believes Eutelsat America and SES-GS will continue to engage in the anticompetitive acts described above, to the detriment of both consumers and competitors.

## DEMAND FOR JURY

TCS demands a jury for all counts.

## PRAYER FOR RELIEF

WHEREFORE, TCS respectfully requests that this Court enter judgment in favor of TCS and against Defendants as follows:

(a)   awarding TCS its actual damages, including compensatory and consequential damages, in an amount to be determined at trial;

(b)   awarding TCS punitive damages, in an amount to be determined at trial;

(c)   trebling TCS's damage award in accordance with the antitrust laws;

(d)   permanently enjoining Eutelsat America and SES-GS from engaging in the illegal activities described herein and provide restitutionary relief;

(e)   awarding TCS its reasonable attorneys' fees and costs associated with this action;

(f)   awarding TCS prejudgment and postjudgment interest at the highest legal rate to the extent provided by law; and

(g)   granting such further relief as may be just and proper.

Dated:  September 18, 2013

/s/ Lora A. Brzezynski
Lora A. Brzezynski
John W. Lomas, Jr.
McKENNA LONG & ALDRIDGE LLP
1900 K Street, NW
Washington, D.C. 20006
202.496.7500

*Attorneys for Plaintiff TeleCommunication Systems, Inc.*